## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EMILY BARRY** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 25-1428** |
| | : | |
| **THOMAS JEFFERSON UNIVERSITY** | : | |
| **HOSPITALS, INC.** | : | |

**McHUGH, J.**                                                                 **April 7, 2026**

### MEMORANDUM

This is an employment action brought by a nurse who practiced at Thomas Jefferson University hospital ("Jefferson") from 2018 until 2023.  When hired, she identified and presented as a male, but during her tenure identified as non-binary, and then later as a woman.  According to Plaintiff, her transitions were not well received by colleagues, and after enduring discrimination and a hostile work environment she was ultimately fired.  According to Jefferson, whatever difficulties Plaintiff may have faced from other employees, it was not aware of those struggles while they were occurring, and it fired Plaintiff because of serious deficiencies in performance that created a risk to patient safety.  With discovery complete, Jefferson now moves for summary judgment.  Because Plaintiff cannot point to sufficient evidence that would support her claims, I am constrained to grant the motion.

### I.        The factual record

Jefferson's Hospital for Neuroscience specializes in neurosurgery and the care of patients requiring neurological care.  Emily Barry Deposition ("Barry Dep.") 35:24–36:3, ECF 21-4.  Within the hospital is the Neuro Intensive Care Unit ("NICU") where patients are considered to be in critical condition, and often unable to walk and speak.  Barry Dep. 33:15–37:20. Emily Barry started at Jefferson in 2018 as an extern in the NICU and was hired as a full-time registered Nurse

in July 2019.  *Id.* 41:1–14, 44:23–45:18.  At the time of hiring, Ms. Barry identified as male, went by the name "Matthew," and used "he/him" pronouns.  *See* EEOC Charge at 2, ECF 21-7. Maryanne McCarrin, Nurse Manager of the NICU, hired Ms. Barry and supervised her throughout her tenure at Jefferson.  Barry Dep. 44:11–17, 45:14–16.  Dennis Caliguri, Vice President of Patient Care Services, supervised Ms. McCarrin.  *Id.* 42:24–43:10.

In the Summer of 2020, before any issue surrounding gender identity arose, Ms. McCarrin placed Ms. Barry on a Performance Improvement Plan ("PIP") for failing to follow medication administration guidelines and parameters for patients and documenting accurate intake and output documentation for assigned shifts on patients.  Barry Dep. 77:2–24, 80:12–15; *see also* Barry PIP, ECF 19-10.  During the PIP, McCarrin met with Ms. Barry "frequently" to provide coaching.  Barry Dep. 80:12–81:5.

At some point in 2021, Nurse Daniel Zaborowski implied that Barry was homosexual, asking with respect to her male housemate, Nurse Hung Lam, who is the "pitcher" and who is the "catcher," prompting fellow Nurse Patrick Becher to laugh.  *Id.* 236:21–237:4.  Around April 2021, Ms. Barry began to suspect that a nude photograph of herself was being circulated amongst Jefferson staff, *id.* 245:10–24, one she had posted on the website Reddit but then deleted within hours.  *Id.* 190:8–191:3; 196:24–197:8.  In her EEOC charge Plaintiff asserted that Nurse Manager McCarrin and Mr. Zaborowski were viewing the photograph and making jokes.  EEOC Charge at 3.  Ms. Barry later walked back this accusation.  In an email with a Jefferson HR representative, she characterized the accusation as conjecture because she had not seen what was on the phone. Apr. 28, 2023 Email from Barry to Pressley, ECF 21-17.  In her deposition, Ms. Barry testified that she did not know whether any Jefferson employees had actually seen or spoken about the photograph.  Barry Dep. 197:9–14.

In June 2021, at a work-related outing,[1] Ms. McCarrin is alleged to have made several explicit comments about the size of Ms. Barry's penis. *Id.* 247:2–22. Ms. McCarrin also asked Ms. Barry about her "interest" in other Jefferson employees. *Id.* Ms. Barry claims that shortly thereafter numerous colleagues began calling her "the Hammer" as a nickname and found her name replaced with "the Hammer" on the unit patient assignment board. *Id.* 247:23–248:16. Ms. Barry believes that this nickname was a harassing reference to the size of her penis.[2]

Plaintiff contends that around this time other colleagues also began to make frequent comments and jokes as to the size of her penis. On June 14, 2021, someone told Ms. Barry that a group of oncology nurses was visiting Ms. Barry's patient in order to check out "the Hammer." Barry Dep. 248:20–249:4. Ms. Barry attributed the comment to either Ms. McCarrin or Mr. Zaborowski, but could not recall which. *Id.* She also testified to at least ten other staff making inappropriate jokes about, allusions, or demeaning references to Ms. Barry's male anatomy. *Id.* 249:5–250:9; 250:13–251:24; 257:15–258:15; 260:5–11; 262:8–13.

On February 9, 2022, Ms. Barry failed to turn one of her patients in their bed and failed to care for the patient's tracheostomy tube. *See* Email from Curran to McCarrin, ECF 19-11; Feb. 7 Warning, ECF 19-12. For this she received a written warning. *Id.*

On October 28, 2022, Ms. Barry attended a work Halloween party dressed as the nurse Florence Nightengale. EEOC Charge at 5; Barry Dep. 172:5–11. This would have been the first time she did not present as male. A colleague allegedly said "I don't get you people" in a

---

[1] Plaintiff describes certain events as work-related. It is not clear whether Jefferson sponsored or hosted the events, or whether it is simply a case of fellow employees being in attendance.

[2] Other staff attest that although the nickname was used, it was created after Ms. Barry had a successful interview with a regulatory entity that was inspecting the unit. *See, e.g.*, HR Investigation: Interview with Jessica Houser, ECF 19-15 at 18-20 ("Emily was interviewed by Joint Commission. One of the male nurses asked how it went and said, 'You nailed it. You're The Hammer.'").

demeaning tone. Barry Dep. at 172:1–15; *see also* EEOC Charge at 5 (attributing this behavior to Nurse Practitioner Ally Heller and quoting Heller as saying "I can't take you people seriously."). Another colleague purportedly compared Ms. Barry to their transgender sister in a demeaning way and encouraged her to take antidepressants. Barry Dep. 172:12–15. Ms. Barry alleges that at this party, Ms. McCarrin engaged in hours of unsolicited flirting and physical contact, which culminated in Ms. McCarrin asking if she could take Ms. Barry home. *Id.* 172:16–173:7.

On November 8, 2022, Ms. Barry failed to document patient vitals over a two-hour period and failed to perform required neurological assessments. She received a written warning. *See* Nov. 8 Warning, ECF 19-13. In her deposition, she asserted that the lack of vitals documentation was due to a computer system issue. Barry Dep. 93:12–18. While discussing the incident with Ms. McCarrin, Ms. Barry articulated a sentiment to the effect of "I am not being accepted for who I am." *Id.* 94:1–16.

Ms. Barry formally identified herself as non-binary through a Facebook post on December 13, 2022. EEOC Charge at 6. She is Facebook friends with some of her colleagues, but prior to that had told one colleague that she was non-binary. Barry Dep. 105:10–106:8. After Ms. Barry changed her name to "MB" on the patient board, Nurse Patrick Becher asked if Ms. Barry was "okay" in a demeaning tone. *Id.* 111:1–9. Ms. Barry was placed on a shift during which all the other nurses were male. EEOC Charge at 6. During this same shift, she says she was "intentionally observed by a transgender [doctor], apparently to assess her behavior in a gatekeeping manner." Pl. Resp. at 29, ECF 21-2 (citing EEOC Charge at 6; Barry Dep. 110:16–112:6). Upon changing her name to MB on the whiteboard during this shift, the charge nurse, Susan Henderson, came onto the unit and said, "Look at all these men!" EEOC Charge at 6; Barry Dep. 114:15–116:3.

On December 27, 2022, Ms. Barry emailed NICU staff stating that she "identifies as trans," and that "[a]s a trans, non-binary individual, [she] prefers to be called MB with the pronouns they/them." Barry Dep. 112:7–11; Dec. 27 Email, ECF 19-16. Following this email, Ms. Barry claims to have been "frequently" misgendered and deadnamed.[3] Barry Dep. 118:13–20. This included being referred to as "man" by fellow nurse and housemate Hung Lam when handing off a report. *Id.* 122:22–123:24. In her EEOC complaint, Ms. Barry also includes several other instances of this sort—including one where she was allegedly misgendered and deadnamed multiple times by Nurse Tiny Bechtel, and another where Nurse Patrick Becher deadnamed her and asked, "[W]hat is wrong with you?" EEOC Charge at 6. In total, she identifies ten colleagues whom she claims engaged in such conduct.

Ms. Barry announced another step in her transition via a Facebook post on March 13, 2023, identifying as female, revealing the name "Emily," and adopting she/her pronouns. EEOC Charge at 6. On March 20, 2023, Nurse Maria Marcolongo purportedly asked Ms. Barry intrusive questions about a potential surgical transition and addressed her as "sir" and her deadname. Barry Dep. 183:8–10.

Meanwhile, performance issues continued. On March 16, Ms. Barry failed to document key metrics on the critical care flowsheets of two separate patients. *See* Final Written Warning, ECF 19-14. During this same shift, she administered medication to a patient at the wrong time for the wrong dosage and failed to remove a catheter despite an order to do so. *Id.* She attributes the

---

[3] Deadnaming is a term first adopted by the transgender community to describe when others continue to make use of a prior name that they have since disavowed. It is now recognized by standard dictionaries, including Merriam-Webster and the Oxford English Dictionary. *See, e.g.*, *Deadname*, Merriam-Webster, https://www.merriam-webster.com/dictionary/deadnaming (last visited Apr. 6, 2026). While it can be inadvertent, when done intentionally deadnaming is associated with anti-transgender sentiment, or a refusal on the part of the speaker to accept the transgender person as they wish to identify.

incorrect dosing to a computer system issue. Barry Dep. 132:22–135:13. For these incidents she received a Final Written Warning.

On April 4, Ms. Barry failed to document a paralyzed patient's tube dislodgement. Barry Dep. 148:10–17; Email from Harley to McCarrin at 3, ECF 19-24. Two days later, she failed to document a tracheostomy tube dislodgement. *Id.* On April 6, Ms. Barry met with Ms. McCarrin and Anthonia Pressley, a Jefferson HR Representative, to discuss the Final Written Warning. *See* Pressley Apr. 6 Notes, ECF 21-14. During this meeting, Ms. Barry said she felt she was being targeted and that, due to her recent transition, did not feel supported. *Id.* On April 10, Ms. Barry emailed Ms. Pressley and Brenda Snipes, Vice President & Associate Chief Diversity Officer, to say that she felt "both discriminated against and the victim of workplace sexual and psychological abuse. My manager has permitted a unit culture that violates Jefferson values and puts other employees at risk." Apr. 10 Email from Barry to Pressley, ECF 21-15. Ms. Pressley and Ms. Snipes met with Ms. Barry on April 14 where Ms. Barry discussed the harassment she had experienced at Jefferson. *See* Pressley Apr. 14 Notes at 2, ECF 21-9.

On April 15, Ms. Barry's colleague received a patient complaint that she had failed to explain, when asked, why certain medications and procedures were administered, and that she did not allow the otherwise-able patient to rise from the bed to use the restroom. Emails from Dolci and Heran at 3–4, ECF 19-25. The following day, Ms. Barry failed to administer a patient's insulin and resulted in hyperglycemic levels. Emails from Cangelosi and Heran, ECF 19-26.

Then, on April 22, Ms. Barry permitted her patient to leave their bed in order to give a urine sample, despite an order prohibiting movement because the patient was disoriented and lacked capacity to make decisions. Apr. 25 Email from Harley, ECF 19-27. The patient fell while out of bed. *Id.* Ms. Barry then took a week-long vacation, intending to return on May 3. EEOC Charge

at 7.  On May 2, Dennis Caliguri, Vice President of Nursing, told Ms. Barry not to come in to work the next day.  *Id.*  The following day, the two spoke about the discipline Ms. Barry received and her patient care issues.  *Id.*  Ms. Barry was terminated, effective immediately, on May 16, 2023. EEOC Charge at 7.  She filed her EEOC Charge on May 25, 2023.  *Id.* at 2.

Ms. Barry brings claims under Title VII, the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO") for discrimination, retaliation, and hostile work environment.

## II.    Standard of review

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322–23 (1986).

## III.    Discussion

### A.  Discrimination

Title VII forbids an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's sex."  42 U.S.C. § 2000e-2(a)(1).

A plaintiff must first establish a *prima facie* case by showing: (1) she belongs to a protected class, (2) she is qualified for the position, (3) she is subject to an adverse employment action, and (4) the circumstances support an inference of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  In establishing a *prima facie*, the *McDonnell Douglas* burden-shifting analysis applies to claims brought under Title VII, the PHRA, and the PFPO.  *See McDonnell Douglas Corp.*, 411 U.S. at 802–03; *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (applying the same framework to claims

brought under Title VII and the PHRA); *Hong v. Temple Univ.*, No. 98-4899, 2000 WL 694764, at *9 (E.D. Pa. May 30, 2000) (finding that PFPO claims are generally evaluated under the same legal framework as Title VII claims).

If established, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.*, 411 U.S. at 802. The employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). If the employer satisfies its burden of production, the presumption of discriminatory action is rebutted and the burden shifts back to the plaintiff to establish that the employer's reason was merely pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804.

Jefferson only disputes the fourth element of the *prima facie* test: whether Ms. Barry's discipline and termination occurred under circumstances that give rise to an inference of unlawful discrimination. *See* Mot. For Summ. J. at 22, ECF 19-1. I will presume the existence of a *prima facie* case, and proceed to the critical issue, whether Jeffersons's reasons are legitimate and genuine, or a mere pretext.

Jefferson's reasons carry substantial weight. In February 2022, Ms. Barry failed to turn a patient in their bed, improperly placed "chunk" blocks under them, and failed to care for the patient's tracheostomy tube. *See* Email from Curran to McCarrin, ECF 19-11; Feb. 7 Warning, ECF 19-12. For this she received a written warning. *Id.* In her deposition, Ms. Barry admits to this conduct. Barry Dep. 83:3–88:8. This complaint was lodged by Nurse Curran, and nowhere in Plaintiff's filings is Curran said to have discriminated against Ms. Barry. Ms. Barry did not

appeal this warning, a process which is offered on the discipline form that she signed. *See* Feb. 7 Warning.

In November 2022, Ms. Barry failed to document patient vitals over a two-hour period and failed to perform required neurological assessments. *See* Nov. 8 Warning, ECF 19-13. Ms. Barry agreed these failures were inappropriate. Barry Dep. 92:23–93:4. The incident was reported by Nurse Caitlin Harley, against whom Ms. Barry does not level any allegations of discrimination. Although in her testimony she attributed the lack of vital signs documentation to a computer system issue, she did not appeal this warning at the time of issuance. *Id.* 93:12–18.

During the night shift between March 16 and 17, 2023, Ms. Barry failed to document key metrics on the critical care flowsheets of two separate patients. *See* Final Written Warning, ECF 19-14. During this same shift, she administered medication to a patient at the wrong time for the wrong dosage and failed to remove a catheter despite an order to do so. *Id.* As to the dosage error, she again invoked problems with the computer system issue but conceded at her deposition that she failed to follow orders about the catheter. Barry Dep. 132:22–135:13. Ms. Barry did not appeal this disciplinary action, either.

There were several more accounts of unsatisfactory patient care in the weeks prior to Ms. Barry's termination. On April 4, Ms. Barry failed to document a paralyzed patient's tube dislodgement, as reported by Caitlin Harley. Barry Dep. 148:10–17; Email from Harley to McCarrin at 3, ECF 19-24. Two days later, she failed to document a tracheostomy tube dislodgement. *Id.* On April 15, Ms. Barry's colleague received a patient complaint that Ms. Barry had failed to explain, when asked, why certain medications and procedures were administered, and that she did not allow the otherwise-able patient to rise from the bed to use the restroom. Emails

from Dolci and Heran at 3–4, ECF 19-25.[4] The following day, Ms. Barry failed to administer a patient's insulin, which was contrary to care guidelines and resulted in hyperglycemic levels. Emails from Cangelosi and Heran, ECF 19-26.[5] In her deposition, Ms. Barry admitted to withholding the insulin against orders, but said it was because she "expected the patient to eat a large meal for breakfast." Barry Dep. 206:21–207:2. Finally, on April 22, Ms. Barry permitted her patient to leave their bed in order to give a urine sample, despite an order prohibiting physical movement because the patient was disoriented and lacked capacity to make decisions. Apr. 25 Email from Caitlin Harley, ECF 19-27. The patient fell while out of bed. *Id.* Ms. Barry admitted to "let[ing] this patient out of bed" and painted the decision as an "error in [her] judgment." May 8 Email from Barry to Caliguri, ECF 19-30.

The ultimate decisionmaker as to Ms. Barry's termination—Dennis Caliguri, Vice President of Patient Care Services—understandably felt that he had sufficient reason to fire her. Caliguri Dep. 24:1–25:10. Based on these several incidents and their impact on patient safety, a factfinder could reasonably find a non-discriminatory rationale for Ms. Barry's termination. Further, Ms. Barry attested to the fact that Mr. Caliguri never made negative comments about her identity, nor acted inappropriately in any manner. Barry Dep. 219:7–19.

To create a triable issue of fact, Ms. Barry "must now show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes*, 32 F.3d at 763. To demonstrate pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe

---

[4] Ms. Barry, when asked if either Dolci or Heran discriminated against her, responded that "there was some bias . . . in the way that [the situation] was interpreted . . . ." but otherwise accuses neither Dolci nor Heran any specific discriminatory or harassing conduct. *See* Barry Dep. 204:10–18.

[5] This incident was originally reported by Nurse Erin Cangelosi, against whom Ms. Barry has not leveled any accusations of discrimination or harassment.

that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764; *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998). The Court of Appeals has described this as a "high hurdle." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002). While Ms. Barry purports to satisfy both methods of demonstrating pretext, she only presents an argument as to the latter. *See* Pl. Resp. at 17–19.

As to the first method of showing pretext, Ms. Barry advances no argument explaining how a jury could reasonably disbelieve Jefferson's articulated reason for her termination. Nor could she, because Ms. Barry has admitted to much of the conduct underlying the disciplinary actions that led to her firing.

As to the second means for proving pretext, Ms. Barry argues that her supervisor, Ms. McCarrin, engaged in direct discriminatory animus. Pl. Resp. at 17–18. She details instances prior to Ms. McCarrin's issuance of discipline concerning the November 2022 failure to document vitals and perform neurological assessments. Pl. Resp. at 18; Barry Dep. 90:8–94:12. This argument fails in two respects. First, most of Barry's errors during 2022 were documented by colleagues whom she concedes showed no bias toward her. Second, Ms. McCarrin was not the decisionmaker as to termination—Mr. Caliguri was. *See Fuentes*, 32 F.3d at 767 (recognizing that comments by non-decisionmakers "unrelated to the decision process are rarely given great weight").

Ms. Barry has not presented any evidence that Mr. Caliguri harbored discriminatory animus towards Ms. Barry due to her status. She attempts to argue that but for the retaliatory animus of Ms. McCarrin, she would still be employed at Jefferson. Given Ms. Barry's well-documented errors and failures to follow the hospital's protocols, which at times put patients in danger, no

reasonable jury could conclude that any bias on McCarrin's part played a meaningful role in Plaintiff's termination.

### B. Retaliation

Plaintiff also asserts that her termination was in retaliation for her complaints to McCarrin and HR about discrimination. Title VII makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

To state a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) her employer took adverse action against her and (3) there is a causal link between the protected activity and the adverse action. *Charlton v. Paramus Bd. Of Ed.*, 25 F.3d 194, 201 (3d Cir. 1994). "If the employee establishes this *prima facie* case of retaliation, the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006) (cleaned up).

Assuming that Ms. Barry has stated a *prima facie* case, her retaliation claims fail for the same reasons as her discrimination claims: Jefferson demonstrates a legitimate, non-retaliatory reason for her termination and Ms. Barry fails to demonstrate sufficient pretext to nullify that reason.

### C. Hostile Work Environment

Ms. Barry also asserts that she was subjected to a hostile work environment.  Under *Bostock v. Clayton Cnty.*, Ms. Barry is considered a member of a protected class at each stage of her gender identity, including when she was male-identifying, and as a non-binary and transgender person, and also as a bisexual individual.  590 U.S. 644, 681 (2020).  She raises claims as to all three.  Pl. Resp. at 25.  To prevail on a hostile work environment theory of sex discrimination, a plaintiff must prove (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) she was detrimentally affected by the discrimination; (4) the detrimental effect was objectively reasonable; and (5) the existence of *respondeat superior* liability.  *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Castleberry v. STI Group*, 863 F.3d 259, 264 (2017).  To the degree that Ms. Barry asserts a hostile work environment based on sex, she appears to delineate harassment against her when she presented as male and harassment based on her nonbinary and/or transgender status.  *See* Pl. Resp. at 25–29; *see also* Compl. ¶¶ 23, 25.

### 1. Hostile Work Environment based on male status

As an initial matter, Jefferson argues Ms. Barry's claims for hostile work environment based on her status as male-presenting are time-barred.  Ms. Barry filed a charge with the EEOC and the Philadelphia Human Relations Commission ("PHRC") on May 25, 2023.  EEOC Charge at 2.  Under Title VII and the PFPO, complainants may file a charge with the EEOC and PHRC within 300 days of the date of the alleged discriminatory practice.  42 U.S.C. § 2000e-5(e)(1); Phila. Code §§ 9-1112(1), (3).  Three hundred days prior to May 25, 2023 was July 29, 2022.  The PHRA sets an even shorter timeline—180 days.  43 P.S. § 959(h).  One hundred and eighty days

13

prior to May 25, 2023 was November 26, 2022.  Ms. Barry seeks to overcome this by establishing a continuing violation.

When assessing timeliness, the Supreme Court has differentiated between "discrete acts" and "hostile work environments."  For discrete acts, which are "easy to identify" and include "termination, failure to promote, denial of transfer, or refusal to hire," parties must file charges within the statutory timelines or "lose the ability to recover for it."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  In contrast, hostile work environments are made up of separate acts which collectively comprise a discriminatory employment practice.  *Id.* at 115–17.  Because a hostile work environment "cannot be said to occur on any particular day," plaintiffs may recover for acts that predate the statutory period if the acts are part of a "continuing violation."  *Id.*

To demonstrate a continuing violation, Ms. Barry "must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period."  *Mandel*, 706 F.3d. at 166–67.  In distinguishing continuing violations from isolated incidents, the Third Circuit has directed district courts to consider "subject matter" and "frequency."  *Id.* at 166.  More specifically, courts should look to "whether the violations constitute the same type of discrimination" (subject matter) and whether the conduct "involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern" (frequency).  *Id.* at 166 n.2, 167.

Under Title VII, discrimination based on sex is unlawful, regardless of one's sexual identity.  *See Bostock*, 590 U.S. at 681.  But the discrimination alleged here differs in significant ways.  The discrimination she describes based on her physical, male-associated anatomy—including the numerous "Hammer" references and other mentions of her penis size—is of a different subject matter than her allegations concerning sexual orientation and non-

binary/transgender status.  The latter includes allegations of misgendering and deadnaming, among other behavior.  *See* Pl. Resp. at 11–12.  Although the challenged conduct was aimed at the same person, the nature of that conduct varied in significant ways, and cannot reasonably be viewed as a continuum.

None of the discrimination alleged while Ms. Barry was publicly identifying as a man is within any of the statutory periods.  In fact, Plaintiff testified that such harassment did not occur after she transitioned.  *See* Barry Dep. 270:1–23 ("Were there any other the comments or did you experience any other comments about your penis size or any other harassing comments or conduct after you transitioned?" . . .  "No.").  Ms. Barry's hostile work environment claim based on her sex assigned at birth is therefore time barred.

   2.  *Hostile Work Environment based on sexual orientation*

It is unclear from Plaintiff's filings which purported instances of discrimination were associated with Ms. Barry's presumed homosexuality.[6]  In her response to Jefferson's Motion, she specifically attributes two occasions.  In 2021, Daniel Zaborowski asked Ms. Barry with respect to her fellow nurse and male housemate, Hung Lam, who is the "pitcher" and who is the "catcher" while another employee observed and laughed.  Barry Dep. 236:21–237:4.  Another employee, Mr. Becher, purportedly also made fun of Ms. Barry for perceived homosexual behavior.  *Id.* at 242:11–243:19.  Both instances appear to have happened in 2021, which is outside each of the statutory periods and the alleged discrimination did not continue during the statutory periods.

This aspect of Ms. Barry's hostile work environment claim based on her sexual orientation is also time-barred.

---

[6] Ms. Barry identifies as bisexual.  *See* Pl. Resp. at 15; Barry Dep. 240:10–16, 261:20–23.  The instances Ms. Barry cites concerning her sexual orientation would appear to be discrimination against *perceived* homosexuality, so I have labeled it as such.

### 3. *Hostile Work Environment based on transgender/non-binary status*

Ms. Barry's claims based on her non-binary and transgender status are not time-barred but disputed by Jefferson on other grounds: first, whether the conduct was pervasive or severe; and second, whether *respondeat superior* can be proven.

### i. <u>Severe or pervasive</u>

Jefferson argues that the discrimination Ms. Barry experienced on account of transgender status was neither severe nor pervasive. Mot. For Summ. J. at 39. Ms. Barry does not directly contradict this argument but recounts proposed evidence that could be used to the contrary. *See* Pl. Resp. at 28.

As proof of discrimination based on transgender status, Ms. Barry includes several incidents involving coworkers. She claims that fellow Nurse Jenny Keckler spoke in a derogatory manner regarding a transgender family member and their transition. Barry Dep. 257:15–258:15. While she alleges this occurred around "2021–2022," it is unclear whether the comments occurred after Ms. Barry came out to her unit via email on December 27, 2022, or that Ms. Keckler was otherwise aware of Ms. Barry's status. Ms. Barry attended a work-related Halloween party in late October 2022 dressed as Florence Nightingale and a colleague stated, "I don't get you people" in a demeaning tone. Barry Dep. at 172:1–15; *see also* EEOC Charge at 5 (attributing this behavior to Nurse Practitioner Ally Heller and quoting Heller as saying, "I can't take you people seriously."). At that same party, another colleague compared Ms. Barry to their transgender sister in a demeaning way and encouraged her to take antidepressants. Barry Dep. 172:12–15.

On December 13, 2022, Ms. Barry changed her name on the patient assignment board to "MB." EEOC Charge at 6. Nurse Patrick Becher then asked if Ms. Barry was okay in a demeaning

tone. Barry Dep. 111:1–9. At this point, Ms. Barry had come out on non-binary in a Facebook post, but it is unclear whether Nurse Becher was aware of Ms. Barry's status.

During her next shift, Ms. Barry was placed in a different unit where all the other nurses were male. EEOC Charge at 6. During this same shift, she says she was "intentionally observed by a transgender [doctor], apparently to assess her behavior in a gatekeeping manner." Pl. Resp. at 29 (citing EEOC Charge at 6; Barry Dep. 110:16–112:6). Ms. Barry does not assert that it was unusual to be placed on an otherwise all-male shift. And the claim that the doctor assessed Ms. Barry in a gatekeeping manner, without more, is purely conjecture.

Upon changing her name to MB on the whiteboard during this shift, the charge nurse, Susan Henderson, came onto the unit and said, "Look at all these men!" EEOC Charge at 6; Barry Dep. 114:15–116:3. Ms. Barry notes that Nurse Henderson was her friend on Facebook but was unsure if she saw Ms. Barry's post announcing her transition to "MB" and they/them pronouns. Barry Dep. 114:15–116:3. That same day, Critical Care Transport ("CCT") Cheri Williams misgendered and deadnamed Ms. Barry. EEOC Charge at 6. Ms. Barry does not assert that CCT Williams was aware of her status, or that she continued the disparaging language following any corrections.

Following her work email coming out as transgender/non-binary on December 27, 2022, Ms. Barry claims to have been "frequently" misgendered and deadnamed. Barry Dep. 118:13–20. This included being referred to as "man" by fellow nurse and housemate Hung Lam when handing off a report. *Id.* 122:22–123:24. When Ms. Barry asked him to refrain from using that word, he apologized but Ms. Barry was unsure whether it was genuine. *Id.* On March 20, 2023, Nurse Maria Marcolongo asked Ms. Barry intrusive questions about potential surgical transition and addressed her as "sir" and her deadname. *Id.* 183:8–10.

In her EEOC complaint, Ms. Barry also includes several other instances. First, that she was misgendered and deadnamed multiple times by Nurse Tiny Bechtel. EEOC Charge at 6. Nurse Patrick Becher allegedly deadnamed her and asked, "[W]hat is wrong with you?" *Id.* Nurses Peter Hagendorf, Alex Devera, Kevin Christino, and John Deangelis purportedly misgendered her in spite of multiple corrections. *Id.* Finally, Ms. Barry was misgendered and/or deadnamed by numerous other nurses as well, including Lee Markovitz, Jessica Houser, and Jen Anderson. *Id.* None of these colleagues were listed as recipients of her December 27, 2022 coming out email, *see* ECF 19-16, and Ms. Barry notes specific awareness only on the part of Hagendorf and Lam due to their friendships, Barry Dep. 269:1–24. But I will assume that each was aware of her transition by this point, especially those who had been corrected.

Ms. Barry admits that the misgendering and deadnaming "could have been a mistake, but it also could have been something more malicious." Barry Dep. 124:1–9. She further describes her belief that "many" occasions stemmed from disrespect as inferred from "[a] furrowed brow; a harsh tone; firm eye contact . . . [and] general appearance of being angry." *Id.* 124:21–125:6.

Conduct is severe or pervasive when it is "sufficient 'to alter the conditions of [the employee's] employment and create an abusive working environment.'" *Moody v. Atlantic City Bd. of Ed.*, 870 F.3d 206, 214 (3d Cir. 2017) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). To assess whether an environment is abusive or hostile, a district court must consider the totality of the circumstances, which include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

18

Many of the instances alleged fall short, most often due to a failure to show evidence that the alleged wrongdoer knew or suspected Ms. Barry's status.  The remaining incidents include the behavior at the Halloween party, Nurses Marcolongo, Bechtel, and Becher's demeaning questions, and the multiple occasions of misgendering and deadnaming.  Because Ms. Barry is not specific as to how often these utterances occurred and which occasions she believed to be malicious, as opposed to mere mistakes, it is difficult to determine if the discrimination rises to the level of severe or pervasive

Looking to the factors set forth in *Mandel*, to the degree that any misgendering or deadnaming was done with intent, then the behaviors alleged by Ms. Barry go beyond offensive utterances and can be deemed humiliating because they dismiss a core part of her identity.  To purposefully refer to a transgender person by their former name goes beyond calling your neighbor "Bob" when he tells everyone his name is "Rob."  When intentional, deadnaming and misgendering are at best dismissive of a person's identity and at worst communicate an unwillingness to accept how another person presents in a manner suggesting that someone is unwelcome or perhaps even unsafe.[7]  This is particularly so at a point in time where transgender individuals are targeted and vilified in public discourse.

In terms of frequency, Ms. Barry lists at least a dozen incidents between her coming out email on December 27 and her termination on May 16.  That represents at least one incident about every twelve days.  Due to the severity and frequency of the alleged harassment, while this is a

---

[7] *See* Chan Tov McNamarah, *Misgendering*, 109 Cal. L. Rev. 2227, 2266 (2021) ("[P]ersons who misgender gender minorities disrespect them by acting in a way that is contrary to the way they've made known they wish to be treated. To understand why, think of the converse. Showing respect involves deference to others. When someone we respect tells us they find our actions or words harmful, we typically stop doing or saying the relevant action or speech, to the extent we are capable. At the very least, we make efforts not to do or say the harmful actions or remarks around that person. To do otherwise would be disrespectful." (citations omitted)).

close case because of the equivocal nature of some of the evidence, I conclude that a reasonable jury could find Ms. Barry experienced severe or pervasive discrimination.

ii.      Respondeat superior

Jefferson argues that Ms. Barry has failed to establish *respondeat superior* liability, and Plaintiff does not seem to offer a contrary argument. The record supports the defense.

Ms. Barry does not allege incidents of harassment based on transgender status by a supervisor. *See also* Barry Dep. 125:7–13 (failing to recollect that Ms. McCarrin ever misgendered or deadnamed Ms. Barry); *id.* at 219:7–19 (denying that Mr. Caliguri ever made negative comments or acted inappropriately). When, as here, non-supervisory employees allegedly harassed the victim, the plaintiff must show that the "defendant knew or should have known of the harassment and failed to take prompt remedial action." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293–94 (3d Cir. 1999). There are two forms of constructive notice. First, "where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer," and second, "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." *Id.* at 294.

As to the first form of constructive notice, Ms. Barry claims to have articulated to her supervisor, Ms. McCarrin, in November 2022 something to the effect of "I am not being accepted for who I am." Barry Dep. 94:1–16. Ms. Barry does not recall using the words "discriminate" or "discrimination," nor did she mention names of specific people or specific incidences in her verbal complaint. *Id.* 94:14–18; 99:12–16. Further, she is unsure if Ms. McCarrin was even aware of her non-binary/transgender identity at this time. *Id.* 100:18–101:5. This does not suffice to put Jefferson on notice.

20

As to the second form of constructive notice, the alleged discrimination—while perhaps pervasive or severe enough to establish the second element of a hostile work environment claim— it was not "so pervasive and open that a reasonable employer would have had to be aware of it." Further, Ms. Barry does not allege that Ms. McCarrin or any other supervisor was ever present during instances of discriminatory conduct, nor allege that McCarrin had been informed of such by other staff.

Ms. Barry did eventually notify appropriate parties of alleged harassment, but not until she verbally complained to HR Representative Anthonia Pressley during her Final Warning meeting on April 6, and again when she filed a complaint with HR on April 10, 2023. *See* Pressley Apr. 6 Notes, ECF 21-14; Apr. 10 Email from Barry to Pressley, ECF 21-15. During the April 6 meeting, Ms. Barry said she felt she was being targeted and that, due to her recent transition, did not feel supported. Pressley Apr. 6 Notes. Ms. Pressley and Brenda Snipes, Vice President & Associate Chief Diversity Officer, met with Ms. Barry to discuss her complaint on April 14. Pressley Apr. 14 Notes at 2, ECF 21-9. The discussion spanned events from 2019 until 2023. *Id.* Ms. Pressley subsequently investigated, including interviewing every witness whom Ms. Barry named in her HR complaints. Pressley Dep. at 27:12–16, 29:13–23, ECF 19-20. There was no time to reach a conclusion or consider remedial measures on Defendant's part as Mr. Caliguri decided to terminate Ms. Barry in early May 2023 while the investigation was ongoing, and his undisputed testimony was that he was unaware of Emily's complaint to HR or the ongoing investigation. *See* Caliguri Dep. at 18:4–12.

The record here does not support a finding that decision-makers were made aware of the conduct alleged until after the Final Warning, and therefore they did not have sufficient opportunity

to address the situation prior to Ms. Barry's termination.  Accordingly, I am constrained to grant summary judgment as to the hostile work environment claims.

**IV.    Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted.  An appropriate order follows.

  /s/ Gerald Austin McHugh  
United States District Judge